CHARLES M. GUILD *vs.* HERVEY M. RICHARDS.

Breach of a condition in a deed does not revest the land in the grantor without entry.

In this commonwealth, as at common law, the grantor of an estate upon condition cannot convey his right of entry for breach of condition to a stranger.

Turning cattle upon land while unimproved and unenclosed, and using the land while in that state as a means of access to adjoining land, is not such an entry for breach of condition as will revest the estate in the grantor.

A parcel of land was conveyed " in consideration of love and good will for and towards the Methodist Church and Society of A." to an individual, " in trust for the use and benefit of said church and society, their heirs and assigns, in trust for the use of the members of the Methodist Episcopal Church usually attending religious worship in A. under the conditions and restrictions hereinafter written," *habendum* " in trust as aforesaid forever, upon the following conditions and restrictions: that the same shall be and remain forever under the control and direction of such members of said church as are embraced with the feelings and opinions of the antislavery society for the immediate abolition of slavery in the United States; and further, that in no case is the general conference of the Methodist Episcopal Church to have any right in said premises and building, or take any control or direction of the same." *Held*, that this deed created an estate upon condition; and that the union of this church with an annual conference subordinate to the general conference of the Methodist Episcopal Church, and receiving a minister appointed by the bishop thereof, and conveying the land to trustees nominated by such minister, according to the usage of that church, were a breach of the condition.

A grantor who has once waived a right of entry for breach of condition cannot afterwards take advantage of it.

ACTION OF TORT for breaking and entering the plaintiff's close in North Attleborough, and carrying away stones and grass. Writ dated August 11th 1857. Answer, soil and freehold in the defendant.

At the trial in the court of common pleas in Bristol at September term 1858, before *Briggs*, J., the plaintiff put in evidence a deed to himself from Samuel Guild, the former owner of the premises, dated February 3d 1853; and there rested his case.

The defendant gave in evidence a deed, dated September 25th 1839, from Samuel Guild to Harrison Holmes, in trust for the Methodist Church and Society of North Attleborough, the material parts of which were as follows:

" Know all men by these presents, that Samuel Guild of Attleborough, County of Bristol and Commonwealth of Massachusetts, yeoman, in consideration of love and good will for and towards the Methodist Church and Society of North Attleborough, which love and good will I do hereby acknowledge, do hereby give, grant and convey unto Harrison Holmes, of the town, county and commonwealth aforesaid, trader, in trust for the use and benefit of said church and society, their heirs and assigns, in trust for the use of the members of the Methodist Episcopal Church usually attending religious worship in that part of the town of Attleborough in the county of Bristol, called and known by the name of North Attleborough, under the conditions and restrictions hereafter written, to wit, a certain lot of land situated in said North Attleborough," described by metes and bounds: " To have and to hold the aforegranted premises to the said Harrison Holmes, in trust as aforesaid forever, upon the following conditions and restrictions: Whereas a building is to be erected or placed upon said premises, to be used by the members of said church as a place of worship, a part of which building is also to be made into a tenement, to be occupied as a family residence, and whereas many of the members of said church are fully persuaded in the practicability of the immediate abolition of slavery in the United States of America, and hold it a solemn duty to do all that lies in their power lawfully to promote said object, and whereas said premises and building being principally purchased and procured by the antislavery members of said church, the same are to be wholly under their control and direction, and in no case what-

ever are any such members of said church as are not believers in and practisers of the doctrines of antislavery to take any part or have any power of controlling the use of said premises and building or in any way disposing of the same, but the same shall be and remain forever under the control and direction of such members of said church as are embraced with the feelings and opinions of the Antislavery Society for the immediate abolition of slavery in the United States, and further that in no case is the general conference of the Methodist Episcopal Church to have any right in said premises and building or take any control or direction of the same, and that said trustees shall not permit any other than antislavery members of the church first named to direct them in the use and disposition of said land and building, and said trustees shall at all times be under their control and direction in the appropriation and disposition of said land and building, and conform to such control and direction. And I do covenant with the said grantees, their heirs and assigns, that I am lawfully seised of said premises; that the same are free from all incumbrances; that I have good right to give and convey the same as aforesaid; and that I will warrant and defend said premises to the grantees, their heirs and assigns, against the lawful claims and demands of all persons, so long as the same shall be used and improved upon the conditions and under the restrictions above written and no longer."

The defendant also gave in evidence a deed, dated October 5th 1840, from Harrison Holmes, "by virtue of the unanimous vote of the Methodist Episcopal Church in that part of said Attleborough called North Attleborough, for that purpose duly passed and recorded upon their book of church records, and in consideration of one dollar paid by said Episcopal Church," conveying the land to the grantor and six others, "trustees of said church, duly chosen, and to their successors in said office and their assigns, in trust for the use of the members of said church usually attending religious worship in said North Attleborough, upon the conditions and under the restrictions hereafter written;" *habendum* "in trust as aforesaid forever, upon

and under the following conditions and restrictions : Whereas a building has been erected and placed upon said premises, to be used by the members of said church as a place of worship, a part of which building is also made into a tenement to be occupied as a family residence, the trustees aforesaid are to hold said premises, with all the privileges and appurtenances thereunto belonging, for the use of said church as aforesaid, subject to the rules and discipline of the Methodist Episcopal Church in the United States of America, and such as are made for the government of the same : Provided however that if at any time hereafter the general conference of the Methodist Episcopal Church in the United States should be divided, none but the members of said church in said North Attleborough who are believers in the doctrines of antislavery shall have the control of the aforesaid premises, or to have any vote in the disposition of the same : Provided also that the said trustees may at any time at their discretion open said building to persons who may from time to time call on them, or a majority of them, wishing to deliver lecture or lectures upon the doctrines and principles of antislavery in the United States, when said building is not otherwise engaged or in use by said church : Provided also that the said trustees shall have the care of said premises under the control and direction of said church, conforming in all things to said rules and discipline, and such as are made by the Methodist Episcopal Church in the United States for the general government of said church."

It appeared that the grantees in this deed, including Holmes, were the sole trustees of that church from the date of this deed to the dissolution of the church and society in 1844 ; that these trustees before the date of this deed incurred a debt of about one thousand dollars in building their meeting-house on the land, and after that date gave their note for that amount, secured by a mortgage of the meeting-house and land, to Joseph Smith ; and on the 17th of August 1843, in discharge of that debt, all the trustees except Holmes executed a quitclaim deed of the meeting-house and land to Smith, who entered upon the land, and by himself and his lessee (who during the

last year was the defendant) remained in quiet occupation of the premises until the 10th of January 1849, when he conveyed them to the defendant, who converted the meeting-house into a hall for lectures and dancing, and in 1855 removed it from the land, and the building was never afterwards used as a meeting-house by any church or society.

The plaintiff proved that the general conference of the Methodist Episcopal Church, as early as the 5th of October 1840, upon the application of the church in North Attleborough, sent to it a minister, who, according to the usage and discipline of that church, appointed Holmes and the other six grantees named in the deed of that date as trustees of the church and society. Holmes testified that, before borrowing the money of Smith, the church put itself under the control and direction of the general conference, according to the discipline of the Methodist Episcopal Church ; and that the trustees, when about giving the mortgage, applied to Guild to give a new deed without the condition that it should not be under the direction of the conference, but Guild declined. The plaintiff contended that these facts proved a breach of the condition of the deed from Guild to Holmes, " that in no case is the general conference of the Methodist Episcopal Church to have any right in said premises and building or take any control or direction of the same " ; and that, upon proper entry by Guild for such breach of condition, the estate would revest in him. And the judge so ruled.

The plaintiff further contended that the extinction of the church and society in 1844 and the conversion of the property to other purposes were a breach of condition, which on proper entry would revest the estate in Guild. And the judge so ruled.

It was proved that Guild occasionally turned his cattle upon the land ; that the land on one side adjoined the road, and was entirely unfenced, so that cattle and carriages could pass in and out without obstruction ; and that at places on other sides the fence was broken down, so that cattle could pass in and out from one lot to another without obstruction. It did not appear that Guild ever did any other act upon the land to constitute an entry for the alleged breach of condition, or ever

gave any notice to Smith or the defendant that he had entered or should enter for breach of any condition in his deed.

Evidence was offered tending to show that Guild and the defendant conferred together occasionally before the 10th of January 1849 about buying the land from Smith to own as tenants at common, at which times Guild set up no title or right on the land; but the negotiations were broken off because they could not agree about the extent of repairs and improvements which should be made after so purchasing.

The defendant contended that if there had been such a breach of condition as entitled Guild to enter upon the premises and repossess himself of his former estate, Guild had never made a sufficient entry to revest the land in him, and that not having so entered he had no interest or estate in the land, which he could convey to the plaintiff. But the judge instructed the jury that the facts proved were sufficient to warrant them in finding that Guild had made a sufficient entry for the breach of condition to revest the property in him; and that if he had not done so, his deed to the plaintiff transferred to the latter the right to enter, so that he might enter and thereby vest the estate in him as Guild might have done.

The jury returned a verdict for the plaintiff, and the defendant alleged exceptions, which were argued in October 1859, and decided in June 1860.

*E. Ames*, for the defendant. 1. Conditions are not favored in law, and are to be construed strictly. The words of the habendum in the deed from Guild to Holmes did not create a condition; because such does not appear by the whole deed to have been the intention of the parties; because they are uncertain; and because the conditions sought to be established are repugnant to the grant. 4 Kent Com. (6th ed.) 129 – 132. *Simonds* v. *Simonds*, 3 Met. 562. *Canal Bridge* v. *Methodist Religious Society*, 13 Met. 349. *Merrifield* v. *Cobleigh*, 4 Cush. 184. *Hadley* v. *Hadley Manuf. Co.* 4 Gray, 140. *Nourse* v. *Merriam*, 8 Cush. 11. *Newkerk* v. *Newkerk*, 2 Caines, 352. *Baldwin* v. *Atwood*, 23 Conn. 367. The words after the last covenant qualify that covenant only. *Estabrook* v. *Smith*, 6 Gray, 572.

2. The submission of the church to the control and direction of the general conference, the receiving of a preacher from that conference, the giving of a mortgage by his advice, and the extinction of the church and society, did not constitute a breach of condition.

3. Any right of entry for breach of condition was waived by the delay to enforce it, and by the negotiations between Guild and Smith. Shep. Touchst. 158. 4 Kent Com. 129. *Goodright* v. *Davids,* Cowp. 805. *Doe* v. *Eykins,* 1 Car. & P. 154. *Ludlow* v. *New York & Harlem Railroad,* 12 Barb. 440. *Underhill* v. *Saratoga & Washington Railroad,* 20 Barb. 467.

4. An estate upon condition can be terminated only by an entry of the grantor or his heirs for breach of condition. Jackson on Real Actions, 2. Stearns on Real Actions, 24. 4 Kent. Com. 127. 1 Saund. 319 note. Rev. Sts. *c.* 59, § 7, & commissioners' notes. *Austin* v. *Cambridgeport Parish,* 21 Pick. 224. *Tallman* v. *Snow,* 35 Maine, 342. *DePeyster* v. *Michael,* 2 Seld. 506, 507. *Ludlow* v. *New York & Harlem Railroad,* 12 Barb. 440. *Underhill* v. *Saratoga & Washington Railroad,* 20 Barb. 467.

5. No entry for breach of condition was proved. The intent of such an entry must appear. Stearns on Real Actions, 20, 43, 45, 46. *Robison* v. *Swett,* 3 Greenl. 324. The occasional turning of cattle upon an unfenced lot was too equivocal. *Kilburn* v. *Adams,* 7 Met. 33.

*E. H. Bennett,* for the plaintiff. 1. The words of the deed created an estate upon condition. *Hayden* v. *Stoughton,* 5 Pick. 528. *Gray* v. *Blanchard,* 8 Pick. 283. *Brigham* v. *Shattuck,* 10 Pick. 306. *Lawrence* v. *Gifford,* 17 Pick. 366. *Austin* v. *Cambridgeport Parish,* 21 Pick. 215. *Hapgood* v. *Houghton,* 22 Pick. 480.

2. The condition was broken by the exercise of control and direction by the general conference over the premises ; and by the dissolution of the church and society, the removal of the meeting-house, and its devotion to other purposes. *Austin* v. *Cambridgeport Parish,* 21 Pick. 215. *Sperry* v. *Pond,* 5 Ohio, 387. *Grissom* v. *Hill,* 17 Ark. 483.

3. The grantor's silence and not entering immediately upon the first breach of condition were no waiver of the forfeiture. *Jackson* v. *Crysler,* 1 Johns. Cas. 125. *Gray* v. *Blanchard,* 8 Pick. 283. *Lawrence* v. *Gifford,* 17 Pick. 366. The negotiations between Guild and Smith amounted to nothing.

4. If there was a breach of the condition before the conveyance to the plaintiff in 1853, no actual entry by the original grantor was necessary in order to enable him to convey his interest in the premises. An entry was not always necessary at common law; a mere claim was often sufficient to avoid an estate granted upon condition. 2 Bl. Com. 154. Co. Lit. 214 *a.* Bac. Ab. Condition, O. Conveying the property to the plaintiff in 1853, long after breach of condition, was making a claim to it, an act denying the original grantee's title. The reasons which made such entry necessary at common law, in order to give livery of seisin, and to prevent oppression by pretended titles, do not now exist. *Cessante ratione, cessat ipsa lex.* But whatever was the old common law on this point, it was changed by *St.* 32 H. 8, *c.* 34, allowing the assignee of a reversion the same right to take possession for condition broken as the assignor had. 4 Kent Com. 122, 123. *Wright* v. *Burroughes,* 3 C. B. 685. Whatever may be the English law on this subject, in this commonwealth a person may convey by deed "any estate or interest in lands." Rev. Sts. *c.* 59, § 1. Guild's interest in this estate could have been devised under *St.* 1783, *c.* 24, § 1, even before breach of condition. *Hayden* v. *Stoughton,* 5 Pick. 528. *Austin* v. *Cambridgeport Parish,* 21 Pick. 215. Although by that statute a person could devise only those lands of which he was "lawfully seised," yet, under the case last cited, Guild could have maintained a writ of entry for breach of this condition, on the day of his conveyance to the plaintiff. He therefore had an interest in the estate, which he could convey by deed.

5. If an entry by Guild was necessary, there was sufficient evidence in the case to warrant a jury in finding it.

BIGELOW, J. The plaintiff seeks to maintain trespass in this case, on the ground that the title to the close is in him, and,

as possession follows the right of property or title, that he may recover against the defendant as a tortfeasor for entering on the premises and removing therefrom the crops and other property. The case for the plaintiff therefore turns wholly on the question whether he shows any valid title to the land in question.

In support of this title he relies on the deed to him from Samuel Guild of February 3d 1853. It appears that the premises originally belonged in fee to said Samuel Guild, and that he conveyed them, by a deed bearing date September 25th 1839, to Harrison Holmes. The plaintiff contends that this deed was upon a condition subsequent; that this condition, long prior to the conveyance to him by Samuel Guild, was broken by the grantees or their assigns; and that thereby the estate reverted to, and was revested in, the original grantor, by whom the condition was created, and was duly conveyed to him by the deed of Samuel Guild first above mentioned. Assuming that the first grant of the estate by Guild was on a condition subsequent, which has been broken, we think it very clear that the deed under which the plaintiff claims the estate is invalid, because Samuel Guild, his grantor, had never entered for a breach of the condition contained in the original deed from him to Holmes, and had no title which he could convey at the time of his grant to the plaintiff.

It is of the essence of an estate on condition, that the right to enter for a breach of the condition is reserved to the grantor and his heirs. It cannot be reserved to strangers. If on the breach of the condition the estate is by the original terms of the conveyance granted over to a third person, it creates an estate upon a conditional limitation and not on a condition. *Brattle Square Church* v. *Grant,* 3 Gray, 146 – 149. An estate on condition is not absolutely terminated by a breach. The law permits it to continue until an entry or claim by the grantor or his heirs. All that remains in the grantor of an estate on condition is a right of entry for breach, which is somtimes called a possibility of reverter. This right or possibility, although it may be released to the person holding the conditional estate, so as to vest the absolute title in him, cannot be con-

veyed to a stranger or third person. A mere right of entry could not be conveyed at common law. It would be contrary to the ancient well settled rule that " nothing in action, entry or re-entry, can be granted over." Co. Lit. 214 *a*. It contravenes the policy of the law, which does not permit the buying or selling of pretended or disputed titles, or rights to real estate, which rest wholly in action. Co. Lit. 214, 215 *a*. 2 Cruise Dig. tit. 13, *c*. 1, § 15. 1 Preston on Estates, 115. Stearns on Real Actions, 24, 33. *Bangor* v. *Warren*, 34 Maine, 324. *De-Peyster* v. *Michael*, 2 Seld. 506, 507. *Nicoll* v. *New York & Erie Railroad*, 2 Kern. 121. It is on this ground, that a disseisor cannot convey his right of entry to a third person, so as to enable the latter to maintain an action. Until he has re-entered and thereby gained his seisin, he cannot convey his right, although under the Rev. Sts. *c*. 101, § 4, he might maintain an action in his own name to recover the estate without any actual entry under his title. Such being the rule in case of disseisin, where the claim is in favor of the purchaser of the right of entry of the real owner as against a disseisor; *a fortiori*, it is applicable to a case like the present, where the claim is made by the purchaser of a right of entry to forfeit an estate for breach of condition against those holding the estate under a grant originally valid. Such forfeitures are not favored by the law. Nor is any change of the rule of the common law, which did not permit the alienation of mere rights of entry, made by the Rev. Sts. *c*. 59, § 1. That authorizes " conveyances of lands or of any estate or interest therein " to be made by deed, but it requires them to be executed by persons " having authority to convey the same." This in terms excludes the conveyance of mere rights of entry, the owners of which have no legal authority to alienate them. *Tallman* v. *Snow*, 35 Maine, 345. The St. of 32 H. 8, *c*. 34, cited by the plaintiff, applied only to estates in reversion strictly speaking, such as that of a lessor, and not to the right of entry or possibility of reverter remaining in the grantor or his heirs in the case of a grant of an estate on condition. Co. Lit. 215 *a*. 4 Kent Com. 123. 2 Cruise Dig. tit. 13, *c*. 2, § 51.

It follows from this view of the rule of law applicable to the alienation of rights of entry, that it was necessary for the plaintiff to prove an actual entry by his grantor, Samuel Guild, for a breach of the condition. Such entry was necessary in order to revest the estate, and give to the grantor a lawful seisin of the estate, which he could convey by deed, in the place of a right of entry whicl he could not aliene. But the evidence offered by the plaintiff fell far short of proving any entry on the land by the grantor for the purpose of terminating the estate of those who held it under his original grant to Holmes. The premises were unfenced, so that they were accessible from the highway, and also from other adjoining land of Samuel Guild. Under such circumstances, the fact that he occasionally turned his cattle upon the land in question was entirely consistent with an intention not to enter for a breach of condition. The act, at most, was equivocal and indecisive. The premises were unimproved and unenclosed, and were so situated as to be conveniently used by Guild to obtain a ready access to his adjacent land. This he might well have done, not intending to assert any title to the *locus.* The plaintiff therefore failed to sustain the burden of proof, which rested on him, of showing by clear and decisive evidence an entry by the grantor for a breach of condition before he made his deed to the plaintiff.

*Exceptions sustained.*

Upon a second trial in the superior court at September term 1860, before *Wilkinson,* J., the plaintiff introduced evidence tending to prove that the church and society mentioned in the deed of 1839 from Guild to Holmes was a new and independent church and society, having no connection with any conference of the Methodist Episcopal Church or any bishop thereof; that some Methodist societies called themselves Episcopal, though not properly such ; that no persons or body of persons are members of the Methodist Episcopal Church, unless as a body or as a church connected with the annual conference and that with the general conference ; and that Guild himself was never a member of that church, but of the Baptist Church.

The plaintiff further offered evidence that the church and society, after receiving the deed from Guild, proceeded to erect a house of worship on the premises, which was dedicated in the summer of 1840; that about that time the church and society became thoroughly united with the conference of the Methodist Episcopal Church, according to the rules and discipline of that denomination, by applying to the conference to send them a preacher, and by the bishop's appointing and sending a minister of that church, in connection with the annual conference, and by his taking charge of said church and society; that by the usages and discipline of the Methodist Episcopal Church the bishop has power to fix the appointment of preachers over the societies that are in connection with the general conference, and to remove them; and that the powers of the bishop are conferred by the discipline, which is enacted or established by the general conference, a body which meets once in four years, composed of delegates from the various annual conferences, and which makes regulations and discipline governing the church, and defining the power of the bishops, preachers in charge, and trustees of the societies in connection with them; that the preacher in charge has absolute power to appoint a board of trustees, without the action or ratification of the church and society over which he is appointed; and the trustees so appointed have power to mortgage, or, upon proper notice to the preacher in charge, to sell, the house and land vested in them as such trustees, to secure or pay a debt due for erecting or repairing their house of worship; that the general conference has no right or title to the meeting-houses or the land on which they stand, and has no control or direction of them, except by establishing the discipline under the regulations of which the bishop, at the annual conferences, appoints preachers who occupy the pulpit and appoint the trustees to whom the title to the land and meeting house is conveyed, and who have the control and direction thereof.

The plaintiff offered further testimony, tending to prove that the minister sent by the bishop, immediately upon arriving at

Attleborough, appointed seven trustees for the church and society, according to the usages and discipline of the Methodist Episcopal Church, and organized the society in connection with the Providence Annual Conference, and that the pulpit was occupied by him for about two years, and afterwards, until the conveyance of the premises in 1843, by successive ministers appointed in like manner. The plaintiff also introduced evidence similar to that introduced at the first trial, in relation to the conveyance of the land, the extinction of the church and society, and the removal of the meeting-house and its conversion to other uses.

The plaintiff also offered evidence tending to show that " very soon after the appointment of the trustees, an interview took place between Holmes and Guild, the grantor, in which Guild said to Holmes that the conditions of his deed had been broken by joining the conference and receiving a preacher from them, and that the land reverted back to him; that he gave the land, not that there might be a minister from the conference, but he wanted a free church; that Holmes applied to Guild for a new deed without any condition, and that Guild said he would not give a new deed, and that he had given all the deed he should give."

The plaintiff contended that by the disbanding of the church and society, and the use of the meeting house for a public hall for lectures and dancing, the abandonment of the house altogether as a place of religious worship, and the final removal of the same from the premises, no other place of worship having since been erected there, constituted a breach of the conditions in the deed, sufficient to entitle Guild to enter and revest himself of his former estate. But the judge ruled otherwise.

The plaintiff contended that the application of the church or society to the conference for a preacher, the appointment of a preacher, and the sending of the preacher to the society or church to preach in that church, his preaching there, and appointment of the seven trustees, the conveyance by Holmes to those trustees, and the subsequent conveyances, and the power which exists to supply the pulpit in the meeting-house, and

other matters hereinbefore shown, constituted a breach of the conditions in the deed, sufficient to entitle Guild to enter and revest himself as of his former estate. . But the judge ruled otherwise, and directed a verdict for the defendant.

The plaintiff alleged exceptions, which were argued at the present term by the same counsel.

BIGELOW, C. J. There can be no doubt as to the intent of the grantor in the original deed, by which the estate in controversy was conveyed in trust for the use and benefit of the Methodist Church and Society in North Attleborough. His leading purpose was to secure the premises, so that they should always remain subject to the control and direction of the anti-slavery members of that church, who were favorable to the immediate abolition of slavery in the United States. To carry out this purpose, the conveyance is expressly made upon certain "conditions and restrictions;" and these words are inserted not only in the granting part of the deed, but also in the habendum. To language so direct and explicit, it is impossible to give any interpretation other than that which results from the plain and obvious meaning of the words. While it is true that conditions subsequent are not favored in law, and words of doubtful meaning are so construed as to create an absolute estate, nevertheless this rule of interpretation has no application where the intent of the grantor is manifest, and is expressed in apt and unequivocal terms. We know of no case where land has been granted for a special use, and the grant expressly made subject to the condition that it should be appropriated and used for the designated purpose, in which it has been held that such a conveyance vests in the grantee any greater interest than an estate on condition. The words *sub conditione* are the precise and technical terms by which an estate on condition is created, and there must be some very strong language in a grant to control and overcome the force and effect of these words. In such cases, to use the quaint language of the books, "without any more saying, the feoffee hath an estate upon condition." In the deed under which the defendant claims title to the premises in controversy, there is

nothing to control the legal effect of the conveyance on condition. On the contrary, the ordinary interpretation of these words best subserves the manifest interest of the grantor, which was to convey the premises for a specific and designated use, and to prevent their being occupied for any other purpose.

It was urged, on behalf of the defendant, that the grant having been made on certain "conditions and restrictions," the word "conditions" is not to have its usual interpretation, but is to be construed as being nearly synonymous with the word with which it is connected, and as meaning regulations or directions only. But the rule that the coupling of words together indicates that they are to be understood in the same sense cannot be properly applied to the construction of an instrument, so as to make a word of an uncertain and indefinite meaning, used inartificially as applied to the subject matter, control the legal interpretation of a word which is apt and technical, and has a well understood and settled signification in the law. The more reasonable application of the rule is that the technical word should control a word of an unsettled meaning, if force and effect cannot be properly given to both.

The only other question raised at the trial was as to the sufficiency of the evidence offered by the plaintiff to prove a breach of the condition. Upon this point we can entertain no doubt. One of the conditions distinctly expressed in the deed is, "that in no case is the general conference of the Methodist Episcopal Church to have any right in said premises and building or take any control or direction of the same." This condition was doubtless framed with reference to the established and recognized rules and discipline of the Methodist Episcopal Church in the United States, which were proved at the trial; and was intended to prevent the estate granted from being under the control and direction of a board of trustees appointed by the preacher, who, according to such rules and discipline, might be designated and sent to the church or society by the bishop. In this way, the grantor sought to subserve his main purpose of keeping the disposition and control of the estate in the hands of the antislavery members of the

church. The evidence offered at the trial clearly proved a breach of this condition. The appointment of a preacher by the general conference, and the designation by him of certain persons as trustees, who, under the rules and discipline, had a right to exercise a certain control over the premises, operated to give to the conference the very direction and control referred to in the condition, which was contemplated by the grantor, and which he intended by this condition to restrain and prohibit.

*Exceptions sustained.*

A third trial was had in the superior court at September term 1861, before *Rockwell,* J., who allowed a bill of exceptions, setting forth the introduction of substantially the same evidence as at the former trials, and the material parts of the rest of which were as follows :

It was admitted by the plaintiff " that there never had been any members of said church in North Attleborough, except such as were embraced with the feelings and opinions of the Antislavery Society, and were antislavery in sentiment;" and " that any condition to defeat the deed upon any such ground merely as that members of this church were other than antislavery should be considered as stricken from the deed, as if the same had never existed."

The defendant contended that there was one condition only in the deed of Guild to Holmes, namely, " that in no case is the general conference of the Methodist Episcopal Church to have any right in said premises and building or take any control or direction of the same;" and conceded that it was proved that the church and society had applied to the conference for a preacher, and had received the preacher appointed by the bishop at the conference, and had connected themselves with the general conference and thereby subjected themselves to the discipline and rules of the conference; and that upon the conveyance by Holmes in 1840 to the trustees appointed by such preacher, there was a breach of the condition, so that Guild might then have re-entered and revested himself as of his former estate, had he seen fit to do so ; but contended

that it had been waived by the omission of Guild to enter and revest himself as of his former estate, and by his inducing and causing Smith to accept a mortgage and a quitclaim deed of the land and to discharge the personal liability of the trustees, and by Guild's encouraging the defendant to purchase of Smith and to go on and make great and expensive improvements and repairs after said admitted breach without notifying either Smith or the defendant of Guild's claim; and introduced evidence tending to show such a waiver before the defendant purchased and repaired and altered the house.

The plaintiff contended that there was a second condition in the deed, namely, that the premises "shall be and remain forever under the control and direction of such members of said church as are embraced with the feelings and opinions of the Antislavery Society for the immediate abolition of slavery in the United States," and that this was broken after the defendant went into the occupation of the meeting house in 1848; and that if there was a waiver of the breach of the first condition, yet, upon a subsequent breach of the second condition, Guild, by making proper entry thereon, might revest himself of his former estate in the land. And the judge so held; and ruled that if there was a time that the house and land did not remain under the control of the antislavery members of the church, "and if the church standing on said land was used for lectures, concerts, shows, dancing parties, and for other public assemblies, and not for the purpose of religious meetings during the occupation of the defendant as lessee in 1848, and as purchaser in 1849, and afterwards, then there was a breach of such second or other condition;" and, against the defendant's objection, admitted evidence to prove this.

The jury returned a verdict for the plaintiff, and the defendant alleged exceptions, which were argued by the same counsel at October term 1861.

BIGELOW, C. J. The trial of this case seems to have proceeded on a misconception of the effect of the evidence, which was offered to show that the religious society had formed a connection with the conference of the Methodist Episcopal

Church of the United States. Assuming that the court was correct in ruling that there were two separate and distinct conditions in the deed, this evidence proved a breach of both. The act of uniting with and placing the property under the control of the conference not only showed a breach of the condition, which was designed to prevent any such connection with the conference, but also of the other alleged condition, so that, after the connection was formed, the building and land no longer remained under "the direction and control of such members of said church as are embraced with the feelings and opinions of the Antislavery Society for the immediate abolition of slavery in the United States." The error at the trial consisted in assuming that the second alleged condition was not broken till the premises were occupied by the defendant as lessee in 1848, or as purchaser in 1849, and in confining the defendant to acts of the grantor subsequent to that time as tending to prove a waiver of it. When a forfeiture is once waived, a court of law will not aid a party in enforcing it. If the grantor, subsequently to the time when the property was placed under the control of the conference and ceased to be under the management and direction of the antislavery members of the society, by acts and conduct which were inconsistent with his right to insist on a forfeiture, waived the breach of the condition, he could not afterwards seek to enforce it by reason of acts which did not create any new or further breach of the condition. In such case the condition was saved, and the right to re-enter was gone. *Goodright* v. *Davids,* Cowp. 805. *Andrews* v. *Senter,* 32 Maine, 394. It is clear therefore that the defendant had a right to rely on the evidence of acts of the grantor, which occurred after October 1840 and prior to 1848, as tending to show a waiver of both the conditions; and that the court erred in ruling that there was a new and distinct breach in 1848, which must be shown to have been waived by acts and declarations subsequent to this period. On this ground, without deciding other questions raised by the exceptions, which on another trial may become immaterial, the order must be

*Exceptions sustained.*

At October term 1864 of the superior court, a trial by jury was waived, and the case was heard before *Lord*, J., who found that the breaches of condition relied on had been waived, and upon his finding judgment was rendered for the defendant